IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CHADWICK JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:10CV561-SRW |
| | ) | (WO) |
| PROGRESS RAIL SERVICES | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Chadwick Johnson brings this action against defendant Progress Rail

Services Corporation pursuant to 42 U.S.C. § 1981 and Title VII, alleging that defendant

discriminated against him on the basis of his race, African-American, when it subjected him

to a racially hostile environment, failed to select him for promotion to Welder II, and

terminated his employment. Plaintiff also contends that defendant retaliated against him for

opposing race discrimination.[1] This action is presently before the court on defendant's

motion for summary judgment (Doc. # 19).  Although he was given an opportunity to do so,

plaintiff has not responded to the motion.  Upon consideration of the motion, the court

concludes that it is due to be granted.

_____

[1] Except as to his termination, plaintiff's complaint is vague regarding the particular acts of
discrimination that form the basis for his complaint. During plaintiff's deposition, plaintiff's attorney
clarified that his claims arise from: (1) incidents involving plaintiff's manager/supervisor, Jim
Vannoy (calculation of attendance points, use of a racial slur, grabbing plaintiff's arm, and
monitoring plaintiff's location, including coming into the restroom to look for the plaintiff); (2)
plaintiff's termination; and (3) plaintiff's non-promotion to the position of Welder II. (Plaintiff's
depo., pp. 139-40, 169-71; see also id., pp. 101-21, 178, 187-89).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## DISCUSSION[2]

Under Title VII and 42 U.S.C.§ 1981, it is unlawful for an employer to discriminate against an employee on the basis of his race with respect to the terms and conditions of his employment. Title VII also prohibits retaliating against an employee for protected activity, including opposing an unlawful employment practice; retaliation claims, if race-based, are also cognizable under § 1981. Porter v. American Cast Iron Pipe Co., 427 Fed. Appx. 734, 736-37 (11th Cir. 2011).

### Hostile Environment Claim

It is not clear that plaintiff asserts a hostile environment claim. Defendant contends that, to the extent he does, plaintiff's claim fails because the alleged instances of racially offensive conduct are not sufficiently severe or pervasive to support a hostile environment claim and because defendant discharged its duty by responding properly to plaintiff's complaint. Plaintiff worked at defendant's Kershaw facility in Montgomery from November 2006 until May 2009. (Seele dec., ¶¶ 6, 14). In his deposition, plaintiff testified regarding

---

[2] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

two incidents involving the Manufacturing Engineering Manager, Jim Vannoy.[3] In a morning

safety meeting in early April 2008, Vannoy was speaking to welding and fabrication

employees regarding work in the shop.  He told them that they needed to "stop nigger – I

mean, jury-rigging stuff up in here."  (Johnson depo., pp. 102-06).  At lunchtime, plaintiff

approached Vannoy in the break room and "told him how offensive that was and how hurtful

it was to use that type of language."  Vannoy denied using any offensive language and "acted

like he didn't know what was going on[.]"

One or two days later, Vannoy apologized to the group, stating, "Whatever I said to

offend anybody, I apologize."  (Id., pp. 107-09).  On April 7, 2008, plaintiff was in the snack

room.  Plaintiff and Vannoy were walking in opposite directions when Vannoy grabbed

plaintiff's arm on his biceps and pulled plaintiff in his direction, causing plaintiff's arm to

hurt, but not sufficiently to cause plaintiff to seek medical attention.  Plaintiff told Vannoy

that he "didn't appreciate him pulling on this arm," and they went to Bledsoe's office to

discuss the situation.  After they discussed the incident with Bledsoe, plaintiff left Bledsoe's

office and returned to work.  A couple of days later, plaintiff requested a meeting with Alex

Zaydel, the plant manager, to report Vannoy's conduct.  Vannoy was present in the meeting.

Plaintiff told Zaydel that he did not think it was "appropriate for someone in that position to

---

[3] Plaintiff initially reported to supervisor Stephen Bledsoe; Vannoy became plaintiff's direct
supervisor in November 2008.  (Seele dec., ¶ 6).  Plaintiff further testified regarding an offensive
comment made by one of his co-employees, Keith Butler.  (Johnson depo., pp. 124-27, 135-36 and
Exhibit 12).  However, plaintiff's attorney clarified that plaintiff's claims pertained to issues with
Vannoy and "[n]ot those past issues with co-employees[.]"  (Johnson depo., pp. 135-41).

be handling employees like that, snatching on them."   Plaintiff also told Zaydel about

Vannoy's previous use of the word "nigger." During the meeting, Vannoy apologized to

plaintiff and Zaydel told Vannoy that he should not touch employees.  Plaintiff did not hear

Vannoy use a racial slur on any other occasion.  (Id., pp. 55-56, 109-23, 187-89).  Plaintiff

also testified that Vannoy "constantly" followed him.  (Id., p. 171).  He stated, "Every time

I go to the restroom, he come looking for me, every time.  If he walked on the floor and I am

in the restroom, he is coming in there, see if I am in one of the stalls, I don't see him doing

that to nobody else."  (Id., p. 170).

"To prove a *prima facie* claim of a hostile work environment, an employee must

subjectively perceive that the harassment is 'sufficiently severe and pervasive to alter the

terms or conditions of employment,' and that subjective perception must be objectively

reasonable based on four factors: '(1) the frequency of the conduct; (2) the severity of the

conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive

utterance; and (4) whether the conduct unreasonably interferes with the employee's job

performance.'"  Garriga v. Novo Nordisk Inc., 390 Fed. Appx. 952, 954 (11th Cir.

2010)(citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir.1999))(en banc)). The

conduct giving rise to plaintiff's hostile environment claim consists of Vannoy's use of the

term "nigger-rigged" during an April 2008 meeting – corrected by Vannoy immediately

thereafter to "jury-rigged" – Vannoy's conduct in yanking plaintiff's arm a few days later,

and Vannoy's actions in "constantly" searching for plaintiff if Vannoy found him missing

from the floor. While the arm-jerking incident involved physical contact, there is no evidence that the incident involved any racial overtones or that Vannoy's conduct was racially motivated. See Reeves v. DSI Security Services, Inc., 395 Fed. Appx. 544, 546 (11th Cir. 2010)(In evaluating the objective severity of harassment, "[w]e do not consider statements or conduct that are unrelated to the [plaintiff's] race."). The same is true of Vannoy's activity in looking for plaintiff, even his searching for plaintiff in the restroom. Plaintiff testified that he did not see Vannoy do this to any other employee; however, plaintiff also testified that about half of the welders were black. (Johnson depo., pp. 49-51, 170).

Additionally, plaintiff requested and received a transfer to second shift two days after the meeting with Zaydel in which he lodged his complaint about Vannoy. The move to second shift significantly reduced any interaction between plaintiff and Vannoy. Plaintiff remained on second shift until March 13, 2009 – two months before his termination – when the second shift was eliminated. (Seele dec., ¶ 16 and Exhibits 14 and 15). Vannoy's use of a racial slur, while offensive, occurred on a single occasion. There is no evidence of record demonstrating that the incidents identified by plaintiff affected his ability to perform his job. See Reeves, 395 Fed. Appx. at 546 (noting the plaintiff's failure "to show how any of the alleged instances of racial harassment affected his ability to perform his job"). Plaintiff worked at defendant's plant for thirty months, between November 2006 and May 2009. The sole incident involving Vannoy shown by the evidence to be race-related was Vannoy's use of a racial slur in early April 2008. Vannoy's conduct, even when considered

along with the single offensive racial comment made by Keith Butler, plaintiff's co-employee, in or around October 2008, was not objectively sufficiently severe or pervasive to sustain plaintiff's hostile environment claim.

### Discriminatory Promotion and Termination Claims

The McDonnell Douglas/Burdine[4] framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination against an employer where, as here, there is no direct evidence of discrimination.[5] See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). This analytical framework also applies to race discrimination claims asserted pursuant to 42 U.S.C. § 1981. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998). The plaintiff must first make out a *prima facie* case of discrimination. Burdine, 450 U.S. at 252-53; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir.1998); Combs, 106 F.3d at 1527-28. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Id. (quoting Burdine, 450 U.S. at 254); Walker, *supra*.

If the plaintiff establishes a *prima facie* case, the employer has the burden of

---

[4]   McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

[5]   In its review of the record, the court noted no evidence which constitutes direct evidence of discriminatory or retaliatory intent.

producing "legitimate, non-discriminatory reasons for the challenged employment action."

Combs, 106 F.3d at 1528 (citing McDonnell Douglas, 411 U.S. at 802). "To satisfy this

intermediate burden, the employer need only produce admissible evidence which would

allow the trier of fact rationally to conclude that the employment decision had not been

motivated by discriminatory animus." Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S.

at 257). If the employer articulates a legitimate, nondiscriminatory reason for its decision,

the mandatory inference of discrimination arising from the *prima facie* case is destroyed.

Walker, 158 F.3d at 1184. The plaintiff must then produce evidence "including the

previously produced evidence establishing the *prima facie* case, sufficient to permit a

reasonable factfinder to conclude that the reasons given by the employer were not the real

reasons for the adverse employment decision." Combs, 106 F.3d at 1528. A plaintiff may

establish pretext by producing evidence that reveals "'such weaknesses, implausibilities,

inconsistencies, incoherencies or contradictions in [defendant's] proffered legitimate reasons

for its actions that a reasonable factfinder could find them unworthy of credence.'" Springer

v. Convergys Customer Management Group, Inc., 509 F.3d 1344, 1348 -1349 (11th Cir.

2007)(quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004)). "However, a

reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and*

that discrimination was the real reason.'" Id. (citing Brooks v. County Comm'n of Jefferson

County, 446 F.3d 1160, 1163 (11th Cir.2006))(emphasis in original).[6]

_____

[6] In some cases, proof that an employer's asserted justification is false, when coupled with
the evidence establishing the plaintiff's *prima facie* case, is sufficient to permit an inference of

Promotion Claim

In March 2007, after plaintiff had worked as a temporary employee for a few months, defendant Progress Rail hired plaintiff into an entry-level "Welder III" position.  In the fall of 2007, defendant posted a "Welder II" position.  Under the guidelines then in effect, an employee could not be promoted to a Welder II position with less than one year in the employee's current position, if the employee had any "active" written warnings for either attendance or performance, or if the employee failed to pass the required welding test.  (Seele dec., ¶¶ 3-4, 6-7, and Exhibit 1).  Plaintiff applied for promotion to the Welder II position.  His supervisor, Stephen Bledsoe, completed an "evaluation record" in connection with plaintiff's application.  To be given an offer, an applicant had to be rated either "Acceptable" or "Superior" overall; Bledsoe gave plaintiff an overall rating of "Marginal."   Bledsoe observed that plaintiff needed more experience and, also, that he was "on Final Warning."  He marked a recommendation stating, "Consider More Qualified Applicant."  (Seele dec., ¶ 7 and Exhibits 4, 5, and 6).[7]   No one was promoted to Welder II as a result of the 2007 posting.  (Id.).  In February 2008, defendant again posted a Welder II position.  Plaintiff's previous written warnings for attendance remained active and he had received two more

---

discrimination.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).

[7] Exhibit 6 to Seele's declaration includes a first written warning for attendance dated June 1, 2007 and a final written warning dated July 5, 2007.  The final warning references a second written warning on June 11, 2007.  All of these warnings were  still "active" under defendant's policy at the time plaintiff first sought promotion to Welder II.  (See Seele dec., ¶¶ 4, 7 and Exhibit 6).

written warnings for attendance, one on January 10, 2008 and another on February 13, 2008.

(Seele dec., ¶ 8 and Exhibit 6).  Plaintiff did not pass the required test for promotion to

Welder II until October 2008.  When he passed the test, defendant's Human Resources

Manager and others reviewed plaintiff's record.[8]  They determined that he then had three

active attendance warnings from January, February and March of 2008 and, also, that he had

amassed attendance occurrences which had not resulted in the appropriate disciplinary action.

Nine attendance occurrences during a "rolling" twelve month period should result in

termination under defendant's policy; plaintiff had eleven such occurrences, but Bledsoe had

not kept track of them.  (Id., ¶ 9 and Exhibit 16; Johnson depo., pp. 64-65).  Supervisor

Wayne Reeves issued plaintiff a "Final Written Warning" on November 13, 2008, advising

plaintiff that he had eleven occurrences, that defendant's policy was to terminate an

employee for cause after nine occurrences, and that because the number of occurrences had

just been discovered, "we are making this a final written warning."  (Id., ¶ 9 and Exhibit 6).

Jim Vannoy, then plaintiff's direct supervisor, told plaintiff that he could not be promoted

to the Welder II position because he "had too many occurrences." (Johnson depo., pp. 70-72).

The guidelines in effect in late 2008 precluded promotion to Welder II of an employee with

---

[8]  Without identifying the others involved, Seele – defendant's Plant Human Resources Manager – testifies that "we did a review of his situation," "[w]e determined that it would not be fair to discharge Mr. Johnson over his attendance issues given that his supervisor had not properly kept up with his occurrences," "we instead issued Mr. Johnson the November 13, 2008 final written warning," and "[w]e advised Mr. Johnson at that time that he would not be promoted to a Welder II position because he failed to meet the criteria for attendance under the internal welding guidelines."  (Seele dec., ¶ 9).

any active written warnings. (Seele dec., ¶ 4 and Exhibit 2).[9] On February 24, 2009, plaintiff

received a first written warning for performance, after the Safety Manager reported that

plaintiff had cheated on a safety exam. (Exhibit 7 to Seele dec.).[10]  Effective March 3, 2009,

the welding guidelines changed so that a single active warning was no longer disqualifying;

an employee could be promoted to Welder II with "no more than one active written warning

for Attendance and no more than one active written warning for Performance[.]" (Seele dec.,

¶ 4 and Exhibit 3).  Plaintiff met this requirement in only one month – April 2009 – but he

received another written attendance warning on May 8, 2009. (Id., ¶ 10 and Exhibit 6).  In

February of 2009, defendant selected another of its employees, Keon Jupiter – also a black

male – for promotion to Welder II.  Jupiter was the only person defendant placed in a Welder

II position between October 2007, when plaintiff first applied for promotion, and plaintiff's

termination in May 2009.  (Id., ¶ 11).

"In the failure-to-promote context, the *prima facie* case consists of showing these

---

[9]  Plaintiff disputes that he had eleven attendance occurrences in November 2008 but provided no specific testimony explaining how defendant's calculation was wrong or alleging that Reeves or any other supervisor or manager involved with the November 2008 written warning knew that the attendance point tally was incorrect. (See Johnson depo., pp. 78-87, 84-96). It is undisputed, however, that plaintiff had at least one active written warning in his record at that time, even without considering the November 2008 warning. (See Exhibit 6 to Seele dec., March 27, 2008 written warning).

[10]  According to the written warning, plaintiff asked for his test back after the group had gone over the exam, and changed several answers.  Plaintiff denied changing any answers, stating that he "just did two tests." (Exhibit 7 to Seele dec.; see also Johnson depo., pp. 128-32 (explaining that he had completed two answer sheets – one with correct answers and the other with wrong answers – and that, after the group went over the examination, he asked for the "wrong sheet back" and left the answer sheet with the correct answers "up there")).

elements: (1) that the plaintiff belongs to a protected class; (2) that [he] applied for and was qualified for a promotion; (3) that [he] was rejected despite [his] qualifications; and (4) that other equally or less-qualified employees outside [his] class were promoted. The comparators for the fourth prong must be 'similarly situated in all relevant respects.'" Brown v. Alabama Dept. of Transportation, 597 F.3d 1160, 1174 (11th Cir. 2010)(citations omitted).  Except for the month of April 2009, plaintiff did not meet the minimum requirements for promotion. While plaintiff satisfied the "qualified" element in that month, the record includes no evidence that a comparator outside of plaintiff's protected class was promoted to Welder II. Accordingly, plaintiff has not met his burden of establishing a *prima facie* case of discrimination as to his promotion.[11, 12]

---

[11]  In her declaration, Seele first states that "Mr. Johnson finally met the attendance criteria to be eligible for promotion during the month of April 2009[,]" but that "[w]e would want to see Mr. Johnson's attendance markedly improve so we could consider him a dependable employee."  She stated, "He would not be promoted merely because he finally was able to have a single month without two active warnings after he had worked for the company for two years[,]" and that "Mr. Johnson's attendance never improved to a satisfactory level to warrant his promotion prior to his termination." (Seele dec., ¶¶ 10, 11). Seele further notes plaintiff's written warning in February 2009 for cheating on the safety test, stating that it "is not the type of behavior that our company would like to reward with a promotion." (Id.).  In addition, Seele states that "Beginning towards the end of 2008 Progress Rail began to limit the amount of promotions and hirings given concerns over the economy." (Id.).  Seele's declaration suggests that promotion to Welder II remained available for plaintiff even after Jupiter was promoted to Welder II.  However, there is no indication in her affidavit that Seele made the decision not to promote plaintiff in April 2009, or of the specific reasons that he was not promoted when he finally overcame the previous impediment to promotion – his failure "to meet the criteria for attendance under the internal welding guidelines." (See Seele dec., ¶ 9).  Because defendant has not presented competent evidence of the decisionmaker's reason(s) for not promoting plaintiff in April 2009, the court does not address defendant's argument that plaintiff cannot demonstrate pretext.

[12]  Plaintiff's Title VII promotion claim is barred because of his failure to exhaust administrative remedies as to that claim.  In his EEOC charge, plaintiff complained of harassment by Vannoy and his termination, but he made no allegation regarding denial of a promotion. (See

Termination Claim

On May 12, 2009, Vannoy informed Seele and Zaydel that Johnson had performed

bad welds and that he had sent the plaintiff home. Vannoy told them that when he questioned

plaintiff, plaintiff became agitated and began using profanity.  Seele and Zaydel investigated

the matter.  Plaintiff's coworker, Mike Palivoda, advised them that plaintiff had performed

the bad weld intentionally and he gave them a written statement summarizing his

conversation with plaintiff.   Palivoda wrote:

> Chad asked me to come to his side where he was welding and he said Look
> how I'm welding and I said why are you doing that and Chad said I'm going
> to tell them I forgot how to weld and I said you know they could fire you for
> that and he said Fuck it and nice working with you... . Chad said Mike you stay
> out of my Bu[si]ness it Between Me and Jim V.

(Seele dec., ¶ 12 and Exhibit 9).  Seele and Zaydel also considered pictures of the welds

plaintiff had performed which, according to Seele, were not done properly.  Plaintiff's welds

had to be redone by another welder, costing defendant seven hours of welder time.  (Id., ¶ 13

and Exhibit 10). Seele and Zaydel decided to terminate plaintiff's employment. Seele

prepared a termination form stating the reason for plaintiff's termination, which she and

Zaydel both signed on May 18, 2009.  She wrote:

> Mr. Johnson was terminated for violation of work rule #8, # 22, and # 19.  Mr.
> Johnson intentionally welded on frame weldment 776539 incorrectly.  When
> Mr. Johnson was questioned about the poor quality of his welds and then told
> to go home he became agitated and began using profane language.  The poor

---

Johnson depo., pp. 155-56 and Exhibit 17).  As defendant argues, investigation of defendant's failure
to promote the plaintiff could not reasonably be expected to grow out of plaintiff's EEOC charge.
See Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970).

quality of his work resulted in 7 hours of rework.

(Seele dec., ¶ 14 and Exhibit 11).

Plaintiff testified that he did not recall making the comments Palivoda attributed to him and that he had not performed welds incorrectly intentionally.  He stated that the "part just wasn't finished."  Plaintiff testified that he was working on the part and took a restroom break, that Vannoy came into the restroom and told plaintiff he needed to see him outside the restroom, and that Vannoy told plaintiff that he was no longer working there and to "get [his] stuff and leave."  When plaintiff asked why, Vannoy responded that plaintiff had put bad welds on parts intentionally.  Plaintiff told Vannoy that he was not finished with the part but had just come to take a restroom break.  Vannoy again told plaintiff to leave.  Plaintiff does not believe that the welds were bad.  (Johnson depo., pp. 141-56).

Defendant argues that it is entitled to summary judgment on plaintiff's termination claim because plaintiff cannot establish a *prima facie* case of discrimination and cannot demonstrate pretext. Seele, who – with plant manager Zaydel – made the decision to terminate plaintiff's employment, has articulated a legitimate, nondiscriminatory reason for plaintiff's termination, *i.e.*, her determination that plaintiff had performed bad welds intentionally.  While plaintiff disputes this conclusion, the court has found no evidence of record that would permit an inference that either Seele or Zaydel did not actually conclude that plaintiff had performed bad welds intentionally.  Plaintiff disagrees that the welds were bad, but Seele and Zaydel concluded to the contrary after reviewing the photographs of the

welds.  Additionally, defendant had another welder spend several hours reworking the welds

plaintiff had performed.  Plaintiff testified that he does not recall making the statements

alleged by Palivoda, but there is no evidence suggesting that Palivoda did not actually

provide the witness statement on which Seele and Zaydel relied or that they believed

Palivoda's statement to be untrue.  Plaintiff's testimony is insufficient to demonstrate that

the legitimate reason articulated by defendant for his termination is pretextual.  See Knight

v. Florida Dept. of Transportation, 291 Fed. Appx. 955, 959 (11th Cir. 2008)("Moreover, the

inquiry is not whether Knight actually sexually harassed Evert. Rather, the inquiry is whether

the employer had a good-faith basis for its belief and the belief actually motivated its

decision.  In reaching an employment decision, an employer is free to weigh the credibility

of different witnesses: 'When the resulting employer's investigation ... produces

contradictory accounts of significant historical events, the employer can lawfully make a

choice between the conflicting versions ..., as long as the choice is an honest

choice.'")(citations omitted).  Additionally, even if plaintiff had produced evidence sufficient

to permit an inference that Vannoy's decision to send him home and report his conduct to

Seele and Zaydel was motivated by plaintiff's race or any other unlawful consideration –

although the court has found no such evidence in the record – Vannoy's involvement in

plaintiff's termination is insufficient to demonstrate pretext under the "cat's paw" theory, as

Seele and Zaydel investigated Vannoy's report of plaintiff's misconduct and relied on their

investigation in making the termination decision.  See Hanford v. Geo Group, Inc., 345 Fed.

Appx. 399, 406 (11th Cir. 2009)(a plaintiff may prove causation under a "cat's paw" theory by showing that "the decisionmaker followed an illegally-biased recommendation without 'independently investigating' the reasoning behind it")(citation omitted). Because plaintiff has failed to produce evidence that the reason articulated by defendant for his termination is pretextual, defendant is entitled to summary judgment on plaintiff's discriminatory termination claim.

### Retaliation

"To establish a Title VII or § 1981 retaliation claim based on circumstantial evidence, the plaintiff must show: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two events." Porter v. American Cast Iron Pipe Co. 427 Fed. Appx. 734, 737 (11th Cir. 2011). "If the plaintiff is able to make out a *prima facie* case, the burden shifts to the defendant to offer a legitimate reason for the challenged employment action. The burden then shifts back to the plaintiff to prove that the proffered legitimate reason is pretextual." Henderson v. FedEx Express, 2011 WL 4600721, *3 (11th Cir. Oct. 6, 2011)(citations omitted). Plaintiff claims that defendant retaliated against him for his complaint to Zaydel in April 2008 about Vannoy's conduct by denying him the promotion to Welder II and by terminating his employment. Defendant contends that plaintiff cannot establish a *prima facie* case of retaliation and, further, that he cannot establish pretext.

Defendant argues, *inter alia*, that plaintiff cannot prove the causation element of his

16

retaliation claims.  In Henderson, the Eleventh Circuit explained the causation element as

follows:

> To establish causation, a plaintiff must show that: (1) the decisionmakers were
> aware of his protected conduct and (2) his protected activity and the adverse
> employment action were not wholly unrelated. Gupta v. Fla. Bd. of Regents,
> 212 F.3d 571, 590 (11th Cir.2000), *abrogated on other grounds by* Burlington
> N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345
> (2006). Close temporal proximity between the protected activity and the
> adverse action may be sufficient to show that the two were not wholly
> unrelated.  See Thomas [v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th
> Cir. 2007)].  If there is a delay of more than three months between the two
> events, then the temporal proximity is not close enough, and the plaintiff must
> offer some other evidence tending to show causation.  Id.  Intervening acts of
> misconduct can break any causal link between the protected conduct and the
> adverse employment action. See, *e.g.,* Kiel v. Select Artificials, Inc., 169 F.3d
> 1131, 1136 (8th Cir.1999)( *en banc* )(explaining that the plaintiff's intervening
> misconduct "eroded any causal connection that was suggested by the temporal
> proximity of his protected conduct and his termination"); cf. Fleming v.
> Boeing Co., 120 F.3d 242, 248 (11th Cir.1997)(holding that the plaintiff had
> failed to establish causation, even though the employer refused to hire her for
> a permanent position shortly after she had filed a complaint of sexual
> harassment, because it was clear from the record that the plaintiff failed to
> meet the employer's qualifications for permanent employment).

Henderson, 2011 WL 4600721 at *4. Assuming that plaintiff's complaint to Zaydel

constituted protected activity, plaintiff has failed to produce evidence sufficient to establish

causation as to either his non-promotion or his termination.  It is undisputed that – because

of his active written warnings – plaintiff was not even minimally qualified for promotion

until April 2009, a year after his complaint to Zaydel, and that plaintiff's termination was

separated from his complaint by a span of thirteen months.  The November 2008 decision not

to promote plaintiff, even assuming he was then eligible, occurred six months after plaintiff's

meeting with Zaydel.   In view of the length of time between plaintiff's complaint regarding

Vannoy and the allegedly retaliatory personnel decisions, plaintiff cannot rely on temporal

proximity alone to prove causation.

Plaintiff has produced no other evidence that defendant's decisions to deny plaintiff

a promotion to Welder II or to terminate his employment were connected to plaintiff's

complaint.   He has not, accordingly, met his burden of establishing a *prima facie* case of

retaliation.  See Higdon v. Jackson, 393 F.3d 1211, 1220 -1221 (11th Cir. 2004)("If there is

a substantial delay between the protected expression and the adverse action in the absence

of other evidence tending to show causation, the complaint of retaliation fails as a matter of

law.").   Additionally, as discussed above, plaintiff has not established that the legitimate

reason defendant has articulated for plaintiff's termination is pretextual.   Further, plaintiff's

Title VII retaliation claim – to the extent it is based on defendant's failure to promote him

– is also barred due to plaintiff's failure to exhaust administrative remedies as to this claim.

While plaintiff alleged retaliation in his EEOC charge, he specified that he was "retaliated

against by being discharged for reporting acts made unlawful under the statute."  (Johnson

depo., pp. 155-56 and Exhibit 17).   Accordingly, defendant is entitled to summary judgment

on plaintiff's retaliation claims.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion for summary judgment is GRANTED. A separate

judgment will be entered.

DONE, this 10th day of November, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE